May it please the court, my name is John Gayhart for Mr. Sanchez. Keep your voice up. Tough to hear you. Yeah, I'm sorry. Speak loudly. Okay. Good morning. May it please the court, my name is John Gayhart. I'm appearing on behalf of Mr. Sanchez. This is the case of the gentleman whose boat broke down just outside of Channel Islands Harbor. The normal harbor tow was not available and the Coast Guard had to come and tow him back in. He called 9-1-1, right? And they came to tow him? I'm not sure if it was the 9-1-1 call or another form of maritime emergency. Anyway, he called for help. Yeah, it was a distress call in terms of the actual mechanism, I'm not sure. So the engines quit? Engine quit? Yes. He was on a small pleasure craft fishing? Yes. He called for help and the Coast Guard came to tow him? Yes. Okay. Got it. And the Coast Guard towed him in and they inspected his vessel. There was nothing wrong with it. He had a California driver's license. He showed us his ID. And the Coast Guard decided to arrest him, detain him for CBP. Can I stop you there? Because this is my whole problem with the case. Yes. He provided a California driver's license and I don't think you object to that in your briefing. But my understanding is they asked him or required that he wait. And it wound up being a two-hour wait. And I think your Fourth Amendment claim to violation is that detention. Yes, the detention there. It was an unreasonable detention because there was nothing wrong with, nothing illegal and no reasonable suspicion to detain him. So that's my problem right there. Okay. I read your briefing to, so I just want to give you an opportunity to tell me what I'm missing. I read your briefing to say that the Coast Guard didn't have a reason to detain him. But I can't see anywhere in the record where you deposed a Coast Guard officer or asked a Coast Guard. I don't know why they detained him. And it was your burden to show that they didn't have reason to detain him. So the first question is, did I miss something? Is there an affidavit or something from the Coast Guard? There's the I-213. I've got that. I've read that. And the I-213 states there's a possibility of four undocumented workers, aliens. The I-213 says the Coast Guard couldn't verify his identity. So he gave him a driver's license. And then the, I have that. And then the I-213 said the Coast Guard could not verify his identity. But that's the only thing I've got about, to explain why the Coast Guard had him wait. Is there something else in the record? I think that's all you need in the record. Your argument is the only reason why they detained him was because of his appearance. Yes. But we don't know that. No one else. Counsel, isn't that an assumption on your part, that that's the only reason? What if they put his name in the computer and they got some kind of feedback that told them there was a problem? I don't know what happened. There's nothing in the record. The Coast Guard doesn't have anything besides the fact that they found him here and then they detained him. But it was your burden to create. Why wasn't it your client's burden to create the record? It's your motion, but I don't think the Coast Guard was ever asked the question. Well, it's our motion to suppress, but it's still the government's burden to prove that the records and that the arrest, as they're proving alienage. They had the burden to prove alienage. That they had arrested him lawfully and detained him lawfully and that the evidence that they are submitting in proof of who he is as an immigrant, his immigrant status, was all lawfully obtained. Now, any of us, if we had gotten that report. In a criminal case, in a motion to suppress, the government has the burden to establish that they had probable cause. In a criminal case, does that same principle apply here? I think so, Your Honor. Why? This is a civil case. It's a civil case, but we are opposing the government's submission of documents. We are saying that the government did not articulate any reason to arrest this gentleman. Let me ask you this. They get his name, correct? No question about that. They can ask for identification. Yes. No problem. And he presents identification. He presents identification. They know his name. Now, let's say that they wrongfully detained him, and the INS officers show up. They've got his name. They run his name through their database, and up pops a record. A record. Yes. Okay. My argument there, Your Honor? What's wrong with that? The detention is wrong, Your Honor. No, but I'm giving you the detention is wrong. Okay. But they get his name, and that's not suppressible under our case law. His name is not suppressible. For purposes of appearing before court, yes. You also have the Garcia-Beltran case. No, they get his name. They could properly ask him, what's your name? They get his driver's license number. INS shows up four hours later, however long it was, and they say, ah, we're going to run his name through our database, and up pops his record. Well, it's Fruit of the Poisonous Tree. That goes to the second part. They already had his record. Why is that Fruit of the Poisonous Tree? That results the fruit is from the unlawful detention, but they get his name. They can properly ask for his name, and that leads them to the record. But that's not what happened. They detained him and then questioned him, and then he's there for many hours. But you're not challenging the driver. He gave his driver's license. And we've already covered that. I think your position is that there was no problem with him giving the driver's license. So they've got his name. Yeah, but just the name alone is. . . Well, that's Judge Bias's point. Once they had the name and they put it in the computer, they were going to come to this other document that predated any of this, right, by several years. Yes. Why is that document the Fruit of the Poisonous Tree? Because the only reason that they detained him, arrested him, put him into these proceedings that were. . . It's not a result of the detention. You've got to go back a step earlier than that, because before the detention he'd already given them the driver's license, and you don't have any objection to that, you've told us. Yeah, but the Coast Guard was unable to determine whether he was legal or illegal. We don't know what the Coast Guard was able to determine. That's my question. But to Judge Bias's question. . . The I-213 says that they only determined that there was a possibility. We don't arrest people based on possibilities. We arrest people based on a reasonable suspicion. What you're saying is that when the Coast Guard determined or decided that. . . We talked about four of them. I guess that would include the child. Decided that his identity was what they relayed to the folks on shore, and the egregious violation was that he was detained solely because of his identity, his Latino identity. That's an egregious violation. Yes, Your Honor. And that carries all the way through. Yes, it carries all the way through. If any one of us was on a boat, we showed our driver's license. That's the heart of your argument. Yes, because if any one of us, like when I take the harbor cruise at the port of Long Beach with my family, I don't bring passports, I don't bring immigration documents. Counsel, what's your strongest support for your statement that the only reason they had to detain him was his appearance? Because it's clear from the I-213 that the Coast Guard had determined that there was only a possibility that they might have someone who's undocumented. They didn't have a reasonable suspicion. Counsel, you're just not answering the question. I'm sorry. You're assuming that the reason they detained him is because of his appearance, and I'm asking you what is your strongest support for that, and I haven't heard the answer. I think it's your assumption. I think my strongest argument to that is the fact that they don't cite any reason for the arrest, for the detention. Okay. And the lack of a reason for detaining a person makes it arbitrary. It's an arbitrary arrest. Well, you know, they could have detained him because they were wearing hats from, you know, San Francisco Giants hats or something. They could have detained him because they took the driver's license and put it in the computer and something popped up, but I don't know that. They didn't say that. The I-213 does not say that. I understand from reading your briefs and your argument and Judge Preggerson's comment is your argument is really the only real basis for detaining them for that four hours for the possibility of checking with INS is that these guys were Latinos. Yes. That's it. On a small boat out in the harbor that broke down. Within territorial waters. Yeah, within the United States territory. That's your argument. Now, they're not going to, you know, nobody's going to say that the only reason why they detained them was because of their appearance. They're not going to say that. I mean, that's the inference you draw from this record because there's, when you go to that I-213, there's no indication. There's no other reason. There's no other reason. Right. Now, they could have, they could, now we don't know because they didn't call, nobody called the Coast Guard officers into the immigration hearing at the hearing and questioned them. Why did you stop? They may have indeed asked them, do you have any documentation of your status in this country? Right? They could have said no. Yes. They could have said no if they had asked that question and that question and if that was in the record, if that kind of scenario was in the record, you wouldn't have because then it would have been proper. Clearly, there would have been a basis to detain them, to bring ICE in to check their records. But we don't have anything like that. We don't know really, as Judge Kristen said, we don't know exactly what happened because we don't have the Coast Guard's version of what they did. So here's what I'm getting at and then I'll stop. Okay. But your argument, your brief reads to me like you're making a profiling case, right? Yes. Somebody was stopped and we've certainly seen those cases, but typically I think what happens in those cases is that the arresting officer is questioned about why did you stop this person, why did you pull him over, you know, and so forth, and then the argument is made that that's a pretext. And I'm missing that first step. But I think we've covered that ground. The best reliance I have, again, is the I-213, what the Coast Guard told the CBP when they radioed in, please come and pick these people up, the possibility of four undocumented workers, aliens. Okay. So then you get to the next. If you want to move past, because we've all heard what my question is, then you get to Judge Pius' question, right, which is they've got the driver's license and they put it into the computer and they find a document that predates what you're calling this Fourth Amendment violation. Okay. So that didn't happen, though. So the question is how is that a fruit of the poisonous tree? No, but that didn't happen, though. It was only after they arrested him, they brought him in, they questioned him, that more information came out and then they determined that. So because if the Coast Guard had run his name. They had his name. If the Coast Guard had run it, though, before it turned him over to CBP and said, look, we definitely have a guy here. And we don't know if they did, by the way, because you didn't ask the question. But anyway, if they had run it, then what? We would have seen in the I-213, Coast Guard reports, they run this name, we have all this information. The officers would have written it up that way. That's what they do when we see all these I-213s. Well, if we had a Coast Guard officer who had testified to that and could tell me what the absence of, you know, what the hole in the record means or what the typical policy or procedure would have been, then I might be able to go with you on this. But it sounds like you're just assuming or wanting me to read that into the record. And I really want to give you an opportunity to tell me what I'm missing, Counsel, but that's the way I see this case. I think that the way I am interpreting the case here and the way I want you to look at this case is that if any one of us had been on that boat and everything was lawful on the boat, there was nothing out of place, just our engine had stalled, and we provide our driver's licenses because there's no requirement of having international travel documents inside the boat. You're saying if that had been my boat, I wouldn't have been detained for two hours. Yeah, you could have been detained for two hours. That's the profiling case. And that's the problem. We never ever see any case or hear of any case of four white guys and their boat breaks down that they get arrested and detained. Oh, we have possibly four undocumented workers, aliens. That doesn't happen. That's my question, Counsel. I mean, what I think you're arguing and you're confirming is a profiling case. And then typically what we do is we would get information from the Coast Guard about why did you do this, why did you stop them, what did you do, did you put the name in the computer, what popped up. That's my only point, and I don't want to belabor the point. Well, you know, I just didn't, I guess, I think there is a legitimate concern that, you know, you have four Latinos on a small boat in the harbor with their boat stranded. One can reasonably infer that the reason why they detained them was to check with ICE. To check for what? One could reasonably infer that the reason why they detained them was because of their appearance. Yes. And that's what led them to check with ICE. Well, held them because apparently they didn't do the checks themselves. Again, what they radioed in is there's a possibility. We don't have a reasonable suspicion. We didn't run this guy's name. There's just a possibility. I don't think a possibility is the same as a reasonable suspicion. The Coast Guard didn't board the boat. It didn't board the boat when they went out to rescue them. When the Coast Guard went out there, did the Coast Guard people go on the boat? I'm not sure if they actually stepped into the boat or just tied a rope to the boat and towed it in. They probably went into the boat afterwards, after the respondent was a petitioner in this forum. It was arrested because it was a very small pleasure craft. It was not an ocean-going vessel. It didn't have large fuel tanks or multiple engines. It's just a pleasure craft to go coastal waters. To go fishing out in the coastal waters. It wasn't deep fishing. This is coastal fishing. So the cancer here was that when they relayed their information to the authorities at the beach, that they used race as the identifying feature. Yeah. It didn't even go to the facts of the group. Is that because you're not supposed to do that? Yeah. Okay. Well, we've let you go way over. So let's hear from the government. Thank you, Your Honors. A pleasure. May it please the Court, Your Honors, Tim Remitz on behalf of the United States Attorney General, Jefferson B. Sessions III. This immigration case, Petitioner, challenges the Coast Guard's search and seizure of this person on the coast as an illegal search, and that he wants to suppress all evidence of identity because of that illegal search. Counsel, were the Coast Guard officers acting as immigration officers here? No, Your Honor. They were enforcing federal law at sea, which is what they are congressionally mandated to do, but they were not acting as immigration authorities. As far as defined by the regulations, this is likely in response to Petitioner's argument, where they are subject to the regulations. I'm sorry, I missed you. Likely what? In response to Petitioner's arguments, they're subject to the code of federal regulations pertaining to immigration authorities. Is this in that line of questioning? Yes. Well, in that line of questioning, they are not defined as immigration authorities, these Coast Guard members. So what reason do they have to have? What do they have to be able to show to detain these people? Well, as the government argued in our brief, it's a border search. Well, it wasn't a border search, Counsel. They're not by the border. No, the Supreme Court has explained on navigable waters that have access to the open ocean. This is a 28-J the government submitted last week. Okay, but they were a couple of miles away, and they were in a tiny little boat. And they're in the harbor. Two to three miles offshore is where the Coast Guard responded. They told them to the harbor before they know really anything, correct? Correct. And there's nothing in the 213 that talks about this being a border search or that they had any reason to think these folks were returning from international waters. So is that the government's position, really, that it's justified as a border search? Yes. And this is what's discussed in that Villamonte Marquez Supreme Court case. So wait a minute. Sorry, I don't mean to interrupt you, but just to complete this thought, because my question is really by what authority were they detaining these people? And your answer is, as a border search, they needed what? No suspicion. As border searches do not require suspicion to briefly explain something. Okay, what if it's not a border search? What if we don't agree we think it's a border search because we think this tiny little boat is not reasonable, think that it possibly could have made it? And it was in the harbor. Yeah. What if it's not a border search? Well, then it requires some other level of suspicion, likely reasonable suspicion. All right. So did they have reasonable suspicion? And if so, where do I see it in here? Reasonable suspicion to just request someone's ID before putting them to go into the shore. So, and I don't think he's questioning or challenging that the Coast Guard could ask for the driver's license. No. Is there anything in the record that would tell me what the Coast Guard did with the driver's license, whether they had reason that there was some suspicion because the face of the driver's license or putting it in the computer or something?  In his motion to the press, he did not submit evidence showing or anything from the Coast Guard saying why they stopped him. Go ahead. Make your point. Discussing his driver's license, he stated he showed the Coast Guard. At first, it's worth noting that he's been twice convicted for not having a valid driver's license in the state of California. Go back to what they knew at the time. He gives them, please, just to help us, because we have a lot of cases today and we want to keep them straight. They give him the driver's license and is it your contention there was something on it that would have told them that he had been convicted previously? Well, potentially it was an invalid driver's license. It was expired. We simply don't know what he showed the Coast Guard. He's never submitted to the record a driver's license. Well, that form, that 213 that the INS officer has prepared, says he showed him his driver's license. I don't believe 213 says that. It says that they couldn't verify his identification. Right. The I-213 says U.S. card not able to establish positive identity or nationality for adult males. It doesn't mention a driver's license. Then where did I get the idea of a driver's license? That's from his own testimony. His testimony states, after he submitted an affidavit, which also does not mention a driver's license, subsequently his testimony says, I did show them my driver's license. But we don't know what that was. It could have been someone else's driver's license. But if you're now really arguing that this is an international border search and taking the position that they didn't need any reason, if that's really the government's position, are we left with the assumption that the Coast Guard thought it didn't need any? That the Coast Guard thought it didn't need any reason to detain these people? Yes, correct. When there's no – it's a border search like this, with a functional equivalent of a border, and I'd like to mention one point from that Villamonte-Marquez case. It discusses this idea of vessels, like petitioner cites, that don't have large fuel tanks, that couldn't have come from international waters. And that Supreme Court specifically notes that there are other cases where a small vessel could link up with a larger vessel at sea and then switch contraband from one boat to another. That is the reason why there's this rule, as Supreme Court stated, that it is a functional equivalent of a border search because you simply do not know what happens on open waters. And he might – How close were they when they hooked up the rope? How close were they to the – Two, three miles from the shoreline, he states. And the territory waters extend three miles out to the United States. Right, I understand that. So as the Supreme Court reasoned, he could have linked up with a smaller boat. I'm not saying that's what happened in this case, but that is why the Supreme Court reasoned. You don't require suspicion to board a vessel and ask for identification. So your government's position is they were coming from international waters? Government's position is simply – I'm pulling out the reasoning of the Supreme Court, saying he could have linked up with another vessel. And as far as he speculates, it's the Coast Guard's reasoning. He also had three other adult males in that boat with him. So do you mean anybody in any boat, anywhere between the beach and three miles out, could be boarded and detained by the Coast Guard for no reason? Is that your government's position? Or a routine border search. Yes, for identification, check the cargo of the boat. And that's what the Supreme Court says in Via Monte Marquez. For example, in that case – So what if my boat was tied up in the harbor? Well, that's exactly – In Via Monte Marquez, it was anchored in the channel passage, 12 miles from the port of entry. In that case, the Supreme Court said that was still a reasonable border search, and they boarded that vessel without suspicion. And then when they were on the vessel, they saw marijuana in the cabin. At that point, it said no suspicion was required because the Fourth Amendment does not require any kind of suspicion. And this is a functional equivalent of a border because these vessels have open access to the ocean, and they could meet up with any other vessel. They could have been coming from anywhere. Does it make any difference here that they towed him into the harbor? I think it makes a difference as far as – And they didn't really begin any questioning, from what I can tell, until they got him into the harbor and out of the boat. I think it makes a difference when you're – In all these cases, in Fourth Amendment cases, you're balancing the interest involved. So it's always, as the Supreme Court has said, a substantial government interest in preventing the entrance of contraband and people who are not permitted to enter the United States from entering the United States. Well, that's why it's so difficult. I think you just put your finger right on it. That's why I'm struggling with this case because we do have to balance, and this record is very undeveloped. Well, it is. Let me ask you this. In a normal criminal case, when you'd have a motion to suppress like this, but somebody's detained or arrested without a warrant, it's always the government's burden to establish probable cause. In a criminal case. In a criminal case. And I realize this is a civil case, but why doesn't that same principle apply here, that it's the government's burden to establish they had reasonable cause or reasonable suspicion to detain somebody? Well, in civil crimes and immigration proceedings, the government's burden is merely to show alienage, and then it shifts to the respondent to show time and place of entry. So is it your position that even if these documents were illegally obtained, the ones that preexisted from the earlier, is it an LPR application? It was an application from Family Union Benefits from his father who legalized. Okay. So if it's your position that those documents were wrongfully obtained, but nevertheless obtained and they admitted and they established your burden for alienage, that then the burden shifts to respondent, sorry, petitioner, to bring a motion to suppression and establish that the documents were wrongfully obtained in the first instance? Yes. Petitioner bears the burden in a motion to suppression case to show a prima facie case of a Fourth Amendment violation in the civil context. Don't you think he's met that here? As a prima facie case of suppression? Right. No, I do not believe he's met that burden here. Why not? Well, as one, we argued this was the Coast Guard acted properly, and that's the second thing he has to prove. Not only was it a reasonable seizure. So if he meets his prima facie case, then it's the government's burden to come back and explain. Yes. But as the government argues, it was a reasonable search and seizure. Oh, yes, but now you're relying slowly on it being a reasonable search and seizure because you didn't need any reason. Correct. That was the government's argument. So it was a border search. Suppose we disagree with you that this was not a border search. Okay. It goes to the second argument, which has to be an egregious unreasonable search and seizure in this case. According to this court's case law, that means that the Coast Guard had to reasonably have known it could not have perpetrated this search and detention at the coastline. There's nothing the Coast Guard had in its possession or any kind of law which stated the Coast Guard was not permitted to do this. In fact, we submitted the Coast Guard manual, which specifically tells Coast Guard officers to interdict migrants at sea, to contact CBP and contact ICE and work with them. You said migrants at sea. That's what it says in the manual, but also any kind of undocumented individual. Well, we don't know if they're undocumented. There were four people in the boat. They didn't know that yet. That's correct. We don't know that. We don't know what he gave to the Coast Guard. He never came forth with evidence. He's never submitted this driver's license, which he said he gave to the Coast Guard. The Coast Guard never mentions a driver's license. Well, he testified. He testified. We don't know what he gave to the Coast Guard and what manual. Did the IJ find him not credible? No. So we can take his testimony as true. So we can take his testimony as true that he submitted a driver's license. We don't know what it said in that driver's license or what was his own driver's license, whether it was still valid. Was he asked to produce it at the hearing? No, but again, it's his burden to show that this suppression of evidence is warranted. I don't know why he hasn't. If it's not a border search, functional equivalent of a border search, it sure looks like he's met a prima facie case of a wrongful detention. He was told to be quiet, to sit down, wasn't he? According to his testimony, yes. This is testimony. That's what he said. Yes. And we know, at least that's my view of this, that the identity of this group of people and their appearance was a primary factor in holding them, towing them back. Of course, they have to do that anyway. They're going to not let people drift out there. But the injection of identity might have illegal aliens here. To me, that's an egregious violation. And we've got cases on that. And that issue has been up before us many times. Correct. Yeah. I believe you authored one of the cases in the 1980s, Argelas-Vasquez, which was about someone being targeted solely for Hispanic appearance. But you're not supposed to take that factor into consideration, a person's appearance, ethnicity. That's supposed to be irrelevant. Isn't that true? That is true. Well, you know, we've got a society that's a multi-ethnic society. And once you start classifying people as to their ethnicity, and then you start drawing inferences from that, then that adds to some of our problems in this country. We've got plenty of tension all over the place. We don't need this. And the cases have said that if that occurs, that violation is egregious. And there are consequences for that. And they kept them there for many hours and moved them back and forth. They got a little kid there, and they didn't leave that place until, what, 8 or 9 that night? I agree this should not be targeting based on racial profiling. But then that's speculation on petitioners' behalf in this case.  Well, but that's my whole point. And I hadn't really thought this through completely. But if he met his prima facie burden, then it's really the government's burden to come forward and to give an explanation about why they detained him. Sure, and that would be if they met his burden. And the government submits he did not meet his burden. You primarily rely heavily on the fact that you believe it's a border search. Yes, and I'd like to make two brief points. Yes, and then that's it. Border search, yes. And regarding the balancing of interests, and a question was asked earlier about whether or not the towing makes any difference in this case, I would argue that in these border search cases where they balance the government interest versus the private interest, they talk about the minimal intrusion on the private individual at the border for a brief detention, which could be two to three hours. And in this case particularly where he contacts the government, he calls 911 and requests their assistance, I would say the interest is even more minimal on the private side. And second of all, the court has authority, and this is in the 28-J we submitted, which was the United States v. Todd Hunter in the 2002 case where it stated specifically the court held, even without suspicion the member of the United States Coast Guard has the right to board a vessel in navigable waters to ascertain the vessel was complying with all federal laws. Do we know if they boarded the vessel here? We don't know that. We don't know. He towed the vessel. We know they towed. They could have just tossed him a rope, right, and said, toss this on. In any event, the case is stating that you can ask for ID, you can ask for what's in the boat. And that doesn't require any suspicion to do that. If you don't have a suspicion to answer, you can contact Customs and Border Patrol. Okay. Thank you, Counsel. We've gone way over. You get one minute. Make your point. With regards to the citations in the 28-J letter that the government brought, they appear inapplicable in this case because those cases involved the legality of searches of vessels. One was in foreign commerce. The other one was moored. They didn't deal with the legality of a seizure, a rest, when the authorities, whether they be the police or Coast Guard or whoever, find nothing wrong on the boat. They don't find any illegal activities. And, again, that goes to the point of, if the Coast Guard had found something illegal on my client's boat, then, yes, arresting him, detaining him, that all makes sense. That's not an egregious violation if he's violated the law somehow. But when they arrest someone who has an ID, who has no need to have passport or visa or anything in territorial U.S. waters in his home harbor, that is where the egregiousness comes out. Okay. Interesting case, counsel. The matter is submitted. Thank you for your arguments this morning.
judges: Pregerson, Paez, Christen